IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT HAUG and ANITA HAUG, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| TED BIERLY and Unknown Persons, | ) |
|     Defendant. | ) |

## COMPLAINT

Plaintiffs, Robert Haug and Anita Haug, by counsel, and for their Complaint against Ted Bierly allege and state as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332(a)(1); 28 U.S.C. § 1332(c)(1).

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and/or (3); 28 U.S.C. § 1391(c)(2); 28 U.S.C. § 1391(d).

### Parties

3. At all times relevant, Robert Haug was a United States citizen domiciled and residing in Iowa.

4. At all times relevant, Anita Haug was a United States citizen domiciled and residing in Iowa.

5. At all times relevant, Ted Bierly was a United States citizen domiciled and residing in Starke County, Indiana.

6. Both Plaintiffs, individually, meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a).

## Factual Background

7. In May 2016, Robert Haug and Anita Haug (collectively hereinafter "the Haugs") purchased a home located at 8025 N. Tippecanoe Dr., Walkerton, Indiana (hereinafter "the Walkerton Home").

8. At time of the Haugs' purchase of the Walkerton Home, the property was in a largely unkempt state.

9. The Haugs then spent several years improving the property, including removing the existing home and building a new home on the property for Robert Haug's Mother to reside there.

10. At the time of the purchase, the Haugs were assured by the advertisements for the property that they would own the land to the water's edge and there was no signage or other indicia that this was not true.

11. After the Haugs completed many of their improvements, members of the public began to show up asking to swim at 'the beach.'

12. The Haugs were unaware of any claim that a beach resided on their property, particularly given the absence of any indication to the contrary during their ownership. Further, the Haugs were very concerned that this was a safety and insurance risk as there was no lifeguard and no signage.

13. The County of Starke, on or about Summer 2022, began to claim the land that the Haugs had been assured was their yard as a beach, tearing up their grass and dumping and raking sand into the area.

14. When the Haugs protested this action, a group of individuals coordinated on various internet and social media sites to drive the Haugs off the property altogether.

15. Matters became far worse as the group of individuals went from mere name-calling online to actively harassing the Haugs in organized ways including, but not limited to:

    a. Organizing a campaign for beachgoers to take selfies on the portion of the property that was subject to disputed claims between the Haugs and the County of Starke (hereinafter "the Disputed Lakefront");

    b. Organizing loud, noisy activities at the Disputed Lakefront with the sole intent to harass the Haugs;

    c. Parking in front of the drive access area for the Haugs to block them in; and

    d. Making rude gestures, obscene commentary, and acting in an aggressive manner towards the Haugs.

16. By Summer 2023, matters had devolved even further to active vandalism with intent to cause serious harm to the Haugs including nails repeatedly thrown into their driveway, their car's lugnuts damaged in a way so as to potentially cause a serious accident, and active discussions of ways to try to fabricate a charge against the Haugs for any imagined crime.

**Assault / Battery**

17. Plaintiffs hereby incorporate rhetorical paragraphs 1-16 by reference as though fully set forth herein.

18. On or about April 12, 2023, Robert Wayne Haug (hereinafter "Wayne") was at 8025 N. Tippecanoe Dr. when he observed that a vehicle had parked in a manner that blocked access to a nearby drive.

19. Wayne took a photo of the front and back of the vehicle with the plate number as there had been several instances of people parking to block his and his neighbors' drives.

20. At the time, Wayne noticed that a guardrail was being moved by Starke County workers to a location that would cause a challenge getting into the lower driveway of his property.

21. When Wayne asked about the placement of the guardrail, he was told by a Starke County worker to go speak with Camire.

22. When Wayne returned, Ted Bierly ("Bierly") had apparently been called to the location as he was coordinating some of the activities on the Disputed Property with Starke County.

23. Ted Bierly then approached angrily and in an aggressive manner, shouting at Wayne and cursing.

24. When Wayne raised his phone to take a picture of Bierly in the hopes that it would dissuade the aggressor, Bierly angrily slammed the phone out of Wayne's hand and began to violently attack Wayne with repeated strikes from his hands and feet.

25. Wayne even managed to reflexively snap a photo when his hand clenched his raised phone as it was being hammered out of his hand by Bierly, capturing the blurry, but still recognizable initial attack.

26. After Bierly ceased his attack, Wayne retrieved his phone and snapped a final photo of Bierly walking away, wearing the same color clothing that is visible in the photo of the attack.

27. Bierly kicked Wayne during his assault so viciously that Wayne's pants bore the imprint of the bottom of Bierly's boot after the encounter.

28. After Wayne managed to fend off Bierly initial attack, Bierly picked up a large rock from the ground and menaced Wayne with it, placing Wayne in direct and immediate fear that Bierly intended to seriously harm or kill Wayne with it.

29. Eventually, Wayne was able to talk Bierly into dropping the rock and was finally able to safely retreat.

30. Due to Bierly's attack, Wayne's right shoulder came to be in constant pain and eventually had to be replaced in early 2024.

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for compensatory damage, punitive damages, and for any and all further relief that this Court deems fair, equitable, and just.

### Intentional Infliction of Emotional Distress / Harassment

31. Plaintiffs hereby incorporate rhetorical paragraphs 1-30 by reference as though fully set forth herein.

32. In early 2022, Bierly and Unknown Persons began conspiring online to come up with plans to harass the Haugs.

33. These matters began harmlessly at first, with mere name-calling and questions about ownership of the Disputed Property, but quickly escalated.

34. By June 2022, the group turned to a mob mentality and began performing activities intentionally designed to annoy or harass the Haugs in an effort to get them to sell their property and abandon the region.

35. The first such effort was started by the comment, "Take a selfie with the horror house in the background!" This was followed by many Unknown Persons taking pictures of themselves in front of the Haugs' home while on the Disputed Property. The desire was to invade the Haugs' privacy and harass or annoy them by taking dozens of photos of the Haugs' home and posting them online.

36. The next effort was an attempt to organize crowds onto the beach with groups of individuals suggesting a frequent karaoke night on the Disputed Property to create a noise nuisance for the Haugs.

37. During this second discussion, ominously, there is a first mention of violence, stating, "I think we should go down there and give [Wayne] a good starke county ass b--- right on the beach I'm sick of hear about this idiot I don't think this guy realizes that starke county has some crazy people around here."

38. From this point, the online mob of Unknown Persons began to increase their aggressiveness, posting proudly about blocking portions of the Haugs' driving access to their property and indicating a desire to cause a confrontation with the Haugs.

39. Throughout 2024, Unknown Persons, reasonably believed to be involved in the online mob, began vandalizing the Haugs' property, including throwing nails on their driveway repeatedly.

40. In Summer 2024, this vandalism escalated to damaging the lugnuts on the Haugs' vehicle in their driveway, in an effort to cause a serious accident.

41. Bierly was a contributor to the online discussion on multiple occasions.

42. The Haugs were, understandably, emotionally distraught at the organized campaigns to harass them and try to drive them from their property.

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for compensatory damage, punitive damages, and for any and all further relief that this Court deems fair, equitable, and just.

## Malicious Prosecution

43. Plaintiffs hereby incorporate rhetorical paragraphs 1-42 by reference as though fully set forth herein.
44. As previously described, Bierly had a longstanding grudge against Wayne and Anita Haug ("Anita").
45. Bierly had written multiple posts online trying to find a way to have Wayne arrested or fined over Wayne's claim to the Disputed Property.
46. Unknown Persons joined in as well, and their ideas and musings included contacting DNR over a buoy that went missing, claiming that Anita had damaged plant life along the lake, claiming that Wayne had cut down a tree situated on land belonging to the County of Starke, claiming that Wayne and Anita had improperly removed a picnic table from the Disputed Property, and, in one instance mentioning that, "Provoked or not provoked will lead to a battery charge either way if [Wayne] gets physical with anyone."
47. Finally, on April 12, 2023, Bierly's hatred of the Haugs, combined with inspiration he took from the musings of Unknown Persons online, came to a head when he viciously attacked Wayne.
48. Bierly reported the actions to a police officer, intentionally lying to claim that Wayne was the aggressor in his report.

49. This resulted in Wayne being charged with the crime of battery.

50. The police report at the time also made mention of a firearm, although Wayne was never armed at any point during the encounter and made no threat involving a firearm.

51. At the time, Bierly knew that Bierly was, in fact, the initial aggressor in the conflict and had attacked Wayne repeatedly in an unprovoked manner.

52. The underlying criminal matter, 75C01-2307-CM-000001, was dismissed pursuant to the State of Indiana's Motion on August 5, 2024.

53. When Wayne informed his employer of a pending hearing, he was terminated from his position he had held for thirty-five (35) years due to the criminal allegations against him.

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for compensatory damage, punitive damages, and for any and all further relief that this Court deems fair, equitable, and just.

## **Defamation**

54. Plaintiffs hereby incorporate rhetorical paragraphs 1-53 by reference as though fully set forth herein.

55. On April 12, 2023, Bierly communicated that Wayne had committed the crime of battery to multiple people, including a police officer.

56. This statement was made knowing it to be false at the time it was made.

57. As a direct and proximate result of Bierly's statements, Wayne lost his long-term position with his employer.

58. Bierly made the statements solely out of malice for Wayne due to Wayne's claims to the Disputed Property, which Bierly bitterly opposed.

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for compensatory damage, punitive damages, and for any and all further relief that this Court deems fair, equitable, and just.

Respectfully submitted,

/s/ Scott Seville
Scott Seville, #36075-45
ROBBINS AND SEVILLE LLC
714 N. Main St.
Crown Point, Indiana 46307
o 219.333.2376 | m 219.333.2375
scott.seville@roseattorneys.com
An Attorney for Plaintiffs